BRANIFF et al. v. COFFIELD et al.

No. 31506.   Dec. 9, 1947.

*190 P. 2d 815.*

Hal C. Thurman, of Dallas, Tex., Paul G. Darrough, John H. Miley, and Richardson, Shartel, Cochran & Pruet, all of Oklahoma City, and Shearman & Sterling and McClellan & Shrewsbury, all of New York City, for plaintiffs in error.

O. A. Cargill, John Barry, and Wm. L. Murphy, all of Oklahoma City, and Speakman & Speakman, of Sapulpa, for defendants in error.

ARNOLD, J.   This action was instituted in the district court of Creek county by A. W. Coffield, Eunice Coffield, and Floyd D. Coffield, hereinafter referred to as plaintiffs, against Earl Ernsberger, various individuals who are sued as officers and directors of the Western Service Corporation, Earl A. Ernsberger & Company, Inc., the Marine Midland Trust Company and the Chemical Bank & Trust Company. The plaintiffs claim damages arising from the sale to them of certain stock of the Western Service Corporation. They allege that said stock is worthless and that the sale was made in violation of the Blue Sky Law of Oklahoma (Ch. 24, art. 23, O. S. 1931, 71 O. S. 1941 §52).

For the purposes of venue and jurisdiction of the person, the Chemical Bank & Trust Company, a foreign corporation, is the resident defendant (State ex rel. v. Mortgage Security Corporation, 175 Okla. 503, 53 P. 2d 560). All the other defendants are individuals and nonresidents of Creek

County and were served with process outside of said county. Unless the district court of Creek county acquired jurisdiction of the person of this principal defendant then its process served outside of that county was ineffective to bring in the other defendants and to confer jurisdiction of their persons in the absence of a general appearance. If jurisdiction of the person of this principal defendant was lawfully acquired by service of summons on its service agent in Oklahoma county, then venue of the action as to the other defendants was lawfully lodged in Creek county and the court there acquired jurisdiction of their persons by the service of the process on them outside of that county, since the action was alleged to be joint and several, and since Creek county was the residence of plaintiffs (Sec. 43, art. 9, Okla. Const.; 18 O. S. 1941 §471; 12 O.S. 1941 §154).

Chemical Bank & Trust Company appeared specially by motion challenging the jurisdiction of the court over its person. In this motion it was alleged in substance that the bank was a corporation organized and existing under the laws of the State of New York and having its office and place of business in the city of New York; that it was not "doing business" in Oklahoma at the time the suit was filed nor had it transacted business in the state at any time since; that plaintiffs' cause of action did not arise out of any business transacted by it in Oklahoma; that it did not own any property in Creek county, and had no capital invested in property there; that it had no debts owing to it there and had no officer, agent or employee residing in that county or in the state except I. R. McQueen, its statutory service agent in Oklahoma county.

By an order sustaining a motion of plaintiffs to strike, the trial court eliminated from defendant's motion all allegations of fact negativing the requisite jurisdiction of the person of foreign corporations which is mentioned in section 43, art. 9, Const., and 18 O. S. 1941 §471, and refused to hear proof in support of those negative allegations. The trial court then overruled the special appearance and objections to jurisdiction, gave defendant an exception, and granted an extension of 20 days to answer and provided in its order that said defendant **"shall not thereby waive its objections to the jurisdiction of its person"**. Both the attorneys for plaintiffs in their motion to strike and the trial court in its order sustaining that motion recognized the bank's notice as going only to the question of jurisdiction of its person.

Did the district court of Creek county acquire jurisdiction over the Chemical Bank & Trust Company through service of summons on its service agent in Oklahoma county, or did it acquire jurisdiction thereafter over the other defendants through their alleged general appearance in the action?

The vesting of jurisdiction over the person of a foreign corporation by service of process on its service agent depends on whether such corporation is "doing business" within the state, or whether the cause of action arose from business previously transacted within the state within the period of limitation. The mere appointment of a service agent in and of itself is insufficient unless the corporation has availed itself of the privilege which its compliance with the law entitles it to exercise.

By the provisions of section 43, art. 9, Const., and 18 O. S. 1941 §471, the state has imposed certain conditions on foreign corporations for the privilege of "doing business" in the state, one of which is its submission to the jurisdiction of her courts by the appointment of an agent on whom process may be served in any action growing out of its business tranacted within the state. By the provisions of 18 O. S. 1941 §472, the state has imposed a similar condition on foreign corporations "doing business" in the state without compliance with its law by making them subject to the jurisdiction of her courts on

proper service of procses through the Secretary of State. It is fundamental that acquired jurisdiction of the person by either method is based on business transactions within the state.

Dunham v. Marine Midland Trust Co. of New York, 175 Okla. 461, 53 P. 2d 254, is a companion case to this one, growing out of the same series of transactions, but arising under the Blue Sky Law prior to the 1931 amendment, in which service was obtained through the Secretary of State under the provisions of section 472, Id. In affirming the order of the trial court sustaining objection to jurisdiction this court in the syllabus said:

"Where corporate securities of a Delaware corporation are sold by the officers and agents of such corporation in Oklahoma in violation of the state's so-called Blue Sky Laws, a foreign corporation engaged in New York as transfer agent of such Delaware corporation is not present and 'doing business' in this state as a party to such sale where it was not a member of a combination or a party to a concerted action to accomplish the common design of violating the laws of this state; and courts of this state cannot acquire jurisdiction of such foreign corporation in a personal action growing out of the sale of such stock by service of summons upon the Secretary of State, as provided by section 126, O. S. 1931."

Marine Midland Trust Company was a codefendant of Chemical Bank & Trust Company in the instant case, but its objection to the jurisdiction, on practically identical allegations as to its not "doing business" in Oklahoma as those contained in the Chemical Bank's motion, was sustained and the case dismissed as to it. This ruling was doubtless based on the holding of this court above quoted in the Dunham Case, which decision had become final prior to the hearing on the motion. Evidently the trial court considered that the appointment of a service agent by the latter was conclusive that it was "doing business" in the state, because it was not permitted to offer its proof on this issue of fact. This is considered to be an erroneous view of the law.

In the case of Verdigris River Land Co. v. Stanfield, 25 Okla. 265, 105 P. 337, this court held that "the appointment of an agent to transact the company's business is not 'doing business' within the meaning of the statute". With equal logic and legal correctness may it be said that the appointment of an agent to receive service of process does not constitute "doing business" or "transacting business" in the state within the meaning of the law. (23 Am. Juris. p. 346, §365.)

In the case of Dunham v. Chemical Bank & Trust Co. et al., 180 Okla. 537, 71 P. 2d 468, wherein the pleadings were practically identical with those in the instant case, and where the evidence was in substance the same, this court affirmed an order of the trial court sustaining a demurrer to plaintiff's evidence, and in paragraph 5 of the syllabus said:

"The registration of plaintiff's certificates of Western Service Corporation stock by the defendant Chemical Bank & Trust Company implied nothing more than that plaintiff's said certificates, and the shares represented thereby, were within the amount of an authorized issue and did not constitute over issues. The action of said defendant in 'registering' said certificates was neither unwarranted nor unlawful in any respect, and did not operate to perpetrate fraud upon the plaintiff. There was no evidence before the trial court to establish as a fact, or from which the inference could be drawn, that said defendant had any knowledge of, was a party to, or in any manner participated in the conspiracy alleged in plaintiff's petition. . . . "

If the allegations of the petition in that case were insufficient as at common law to confer jurisdiction of the person of this foreign corporation in an action for participation in a fraudulent conspiracy. to sell worthless stock in violation of the then existing Blue Sky Law of the state, does the same state of facts in the instant case confer juris-

diction of the person of the same corporation under the later and now subsisting Blue Sky Law of the state?

This instant action was predicated on a later legislative act than that involved in the two Dunham Cases, supra (Coffield et al. v. Ernsberger et al., 187 Okla. 79, 101 P. 2d 251), and was based on an alleged conspiracy and scheme to sell the stock of Western Service Corporation, which was alleged to be worthless, and that Chemical Bank & Trust Company participated in this general plan, scheme and conspiracy of presenting and selling this worthless stock to the public. This later act on which this action is predicated is 71 O. S. 1941 §52 (ch. 24, art. 11, sec. 16, S. L. 1931). There is no element of common law liability under this section, but liability is specifically imposed jointly and severally upon "the person making such sale and every director, officer or agent of or for such seller, if such director, officer or agent shall have personally participated or aided in any way in making such sale . . ." section 1 of the act defines certain terms used therein. "Agent" is defined as a salesman as that term is defined in the act. "Salesman" is thus defined:

" 'Salesman' shall include every natural person, other than a dealer, employed or appointed or authorized by a dealer or issuer, to sell securities in any manner in this state. The partners of a partnership and the executive officers of a corporation or other association registered as a dealer shall not be salesmen within the meaning of this definition."

It seems clear from this that Chemical Bank & Trust Company, not being a natural person, could not be an agent of the issuer of such stock and could not personally participate or aid in any way in this state as such "agent" in making such sale in violation of the Blue Sky Law and was, therefore, not doing or transacting such business in the state.

By the terms of 25 O. S. 1941 §2, this court is required to give recogni-tion to the legislative definition of a word or phrase in any statute, so that the definition given of the word "agent" in section 1 of the Blue Sky Law (71 O.S. 1941 §1) must be applied to the word "agent" as used in section 52 of the same act, specifying those to whom liability attaches under that section. Even without this statutory requirement, the general rules of statutory construction would require that this be done. In Lewis' Sutherland Stat. Const. (2d Ed.) sec. 358, it is said:

"Where the lawmaker declares its own intention in the enactment of a particular law, or defines the sense of the words it employs in a statute, it not only exercises its legislative power, but exercises it with a plausible aim; for it professes to furnish aid to a correct understanding of its intention, and thus to facilitate the primary judicial inquiry in the exposition of the law after it is finished, promulgated, and has gone into practical operation. The Legislature in passing an act may declare its meaning and construction, and such declaration will be binding on the courts."

Defendants in error have cited a number of cases from other jurisdictions to sustain the liability of the Chemical Bank in this action. An examination of these authorities fails to disclose their applicability to the fact situation here. Mosley v. Unruh (Kans.) 95 P. 2d 537, and Daniels v. Craiglow (Kan.) 292 P. 771, both involved individual defendants who were corporate officers residing in the state who would be liable as such under our law for having participated in the sale. In Salo v. Northern Savings & Loan Ass'n (Ore.) 12 P. 2d 765, the court sustained liability of a domestic corporation as a dealer under the Blue Sky Law of that state. Other cases cited are of similar import.

On the former appeal of this case (187 Okla. 79, 101 P. 2d 251), it was held that plaintiffs' petition contained allegations "sufficient to withstand a general demurrer," which, of course, admits all facts well pleaded. Care-

fully and well pleaded allegations of fact, good against general demurrer, may fail utterly when weighed in the balance of the proof adduced. Nowhere in the evidence of plaintiffs is there any convincing proof of knowledge on the part of Chemical Bank & Trust Company that its name was used by salesmen to boost the sales of stock, and certainly its genuine signature was not so used because that signature only appeared after certificates were issued by the transfer agent, the Marine Midland Trust Company, and delivered by it to the bank for registration.

The theory of the bank's liability is dispelled by the absence of any proof of scienter and the admitted and obvious fact that it was not a natural person.

At the conclusion of plaintiff's evidence the bank interposed a demurrer thereto· which the trial court overruled and allowed an exception. This ruling of the trial court is considered erroneous.

Did the district court of Creek county acquire and retain jurisdiction of the persons of the individual defendants who were nonresidents of the county?

The subject-matter of the action is one of which the district courts of the state have jurisdiction. The allegations of plaintiff's petition showed their residence to be in Creek county; that one of the defendants was a foreign corporation licensed to do business in the state; that its liability and that of the individual defendants was joint. Under these allegations the venue was properly laid in Creek county. (Sec. 43, art. 9, Okla. Const.; 12 O. S. 1941 §154; 67 C.J. §27).

D. W. Ohern and J. Murray Henry each appeared specially and filed motions to quash summons and the return thereof "because the same was not issued, served and returned according to law" without raising the question of venue or of jurisdiction of their persons. Dean M. Stacy appeared and filed motion to strike certain language from plaintiffs' petition, but without raising other questions. J. D. Garnett appeared and filed a motion to dismiss, subsequently defaulted and permitted judgment to be entered against him by default. These pleadings by these several defendants constituted general appearances by them. (Oklahoma Ry. Co. v. Boyd, 140 Okla. 45, 282 P. 157; Ada-Konawa Bridge Co. v. Cargo, 163 Okla. 122, 21 P. 2d 1; Eureka Tool Co. v. Collins, 182 Okla. 552, 78 P. 2d 1057.)

T. E. Braniff filed a motion to quash, a plea to the jurisdiction of his person and a challenge to the venue in one instrument. The record does not disclose any action by the court on this motion otherwise than by a minute of the court clerk dated January 21, 1936, appearing in minute book 12, page 446. This minute is not properly a part of the record because it nowhere appears to have been entered in the journal of the court which is required to be kept by the clerk (12 O.S. 1941 §24) and signed by the judge (12 O. S. 1941 §703). No journal entry of this order was ever filed. It may not be considered as evidence of the court's action on this motion. Thereafter this defendant filed a demurrer and later an answer joining issue on material allegations of the petition. This constituted a general appearance. P. A. Janeway's pleadings in the case followed the same pattern, his answer also seeking affirmative relief.

It is impracticable to set out in detail the allegations of plaintiff's petition, but its substance is that the defendants entered into a conspiracy for the purpose of selling stock of the Western Service Corporation, a Delaware corporation, illegally in this state in violation of the terms of the Securities Act, known as the Blue Sky Law; that the individual defendants are officers, directors or agents of said corporation and as such participated personally in the plan or conspiracy to sell and dispose of the stock of said corporation illegally; that plaintiff's purchased cer-

tain shares of said stock on September 3, 1931, for a consideration of $42,300; plaintiffs sought recovery of the purchase price together with interest thereon and attorney fees.

Each defendant filed a separate answer joining issue on the facts alleged. Some of them pleaded special defenses, but since the judgment of the trial court was based on findings of fact made from the evidence introduced, it is not necessary to notice these special defenses in detail.

Replies were filed to these separate answers and the cause was tried to the court, a jury having been waived.

In addition to the facts disclosed and considered by this court in the Dunham Cases (175 Okla. 461, 53 P. 2d 254, and 180 Okla. 537, 71 P. 2d 468), and which records were in evidence in this case by stipulation of the parties, the principal evidence of plaintiffs was the testimony of A. W. Coffield and F. D. Coffield. In substance, the former testified:

That in 1931 he was living in Chanute, Kan.; in December, 1931, he purchased $42,300 worth of stock of Western Service Corporation. The witness identified Exhibits 8 to 19, inclusive, as certificates of the stock so issued, and tendered said stock into court for the defendants. Ralph Cochran was the first person whom he contacted with reference to buying this stock; it was along in the spring of 1931; he told witness about Mr. Ernsberger who was interested in an electric or gas line in the western part of the state, and that he had made a great deal of money for the stockholders. He also told witness about Mr. Janeway; I knew him; I got acquainted with him in the bank at Oklahoma City; he told me about Mr. Pietch, Mr. Laubenheim—Mr. Braniff, a gentleman I knew by reputation but not personally, and he went on to tell me about the amount each one of them had invested. Mr. Cochran told me that Mr. Pietch and Mr. Laubenheim had $50,000 each invested in the same

kind of stock he was trying to sell me; that Mr. Janeway had $25,000 or $50,000 in the same kind of stock; that Mr. Garnett of Elk City had $35,000 invested in the same kind of stock and that he was trying to mortgage his cotton seed oil mill in Elk City in order to buy $100,000 worth of common stock at that time. I asked him how much Mr. Ernsberger had and he said, "250,000 of his own money invested in this Western Service Corporation and would put in a million if it was necessary". He said that Mr. Braniff had a good share of it. On September 1, 1931, Mr. Laubenheim of Oklahoma City came to my office and told me what a wonderful thing this stock was; that it paid 8% and then every three or six months a quarterly dividend, and that you could get your money back any time you wanted it after twelve months, by giving 30 days' notice. I was asking him in regard to the indebtedness and stuff of that kind pertaining to this Western Service Company and he told me Ernsberger bought everything that went into Western Service Company and paid cash for it and thereby got a big discount. Laubenheim kept on trying to make the sale and said the stock was going mighty fast; that he would call the main office and see if they had that much stock that morning; that it was going so fast—he went out and was gone some 25 minutes, then came back in a big hurry and said, "Yes, we just about got that much and I told them to keep it back for you, that I had sold it to you".

The witness was then exhibited a pamphlet containing pictures of Janeway, Braniff, Laubenheim, and Ernsberger, and stated that the salesmen showed him literature like that; that they showed him the article in the Guthrie Morning News dated March 24, 1931; that they showed him the article appearing in the Harlow Weekly dated April 11, 1931. Mr. Laubenheim was talking about the stock being so good and what a wonderful opportunity it was for people to make money, and I

610

said: "Mr. Laubenheim, is your company in debt; do you owe any bills?" and he said: "Oh, no, we don't have any bills—we pay them every Saturday night and Monday morning we have a clean slate to go on". The next morning, September 2 we went to Oklahoma City and that evening I signed a little piece of paper, little stock sales proposition, and on the morning of September 3, there was an article in the paper about the State of Texas ousting the Western Service Company from that state and wasn't going to let them sell stock. When I saw that article, I asked Laubenheim for the little paper which I had signed and he got it and handed it to me and I tore it up. On the evening of September 2, we went to the American First National Bank and I asked a man named Johnson if he knew anything about this Western Service Company and Mr. Janeway and Braniff, and he said: "I don't believe that Mr. Janeway, Mr. Braniff, Mr. Ernsberger, and Mr. Laubenheim, or Mr. Pietch, or any of those gentlemen, would be mixed up with anything that was the least bit shady". I went to the Better Business Bureau and got the same answer there. Before I bought the stock I ascertained something about Mr. Braniff's reputed financial ability, but I knew Mr. Braniff in a business way and I thought if a man like Mr. Braniff, with his ability and financial power, could put in the better part of his wealth, I could easily put in $42,000. I would not have made this investment if those things had not been told to me.

The morning we bought the stock I asked Ernsberger: "How about your state laws and complying with the Blue Sky Law," and he said: "Oh, yes, sure." I asked him: "Have you got the right to sell stock in Oklahoma?" and he said: "Oh, yes, we couldn't think of going into business in the State of Oklahoma without having all these laws complied with". He said that they had a charter from the State of Oklahoma and that the main office was at Oklahoma City. Mr. Laubenheim took a piece of paper and made a little circle representing Oklahoma City, then he ran a line up to Guthrie, representing Oklahoma City to Guthrie, one up in Kansas, one up in Missouri, then over to Shawnee and to every place that they were supposed to do business, and back to this little place in Oklahoma City, showing that Oklahoma City was the hub of this operation. Preceding the sale of this stock, Mr. Ernsberger said to my son and me that it would be a few days before we got the stock because "these National banks, two of them are worth better than thirty million apiece, and they will have to issue this stock to you, and it will take a few days to sign the stock to you and indorse the stock, that will more than doubly secure the investor his money, because the banks are holding the stock." In regard to the article about the trouble in Texas, an attorney for the company came in. I had known him quite awhile and I asked him about it and he said that it didn't amount to anything—just a matter of jealousy and that they would straighten that out. I first learned that they did not secure a permit to sell this stock in Oklahoma in 1933. I would not have bought the stock if I had known they had not qualified to sell it in Oklahoma. In about a couple of months we got a check for $846 as a dividend. The witness identified exhibit 20 as the dividend check. I first learned that the representation with reference to the money that Janeway, Ernsberger, Pietch, Braniff, and those men put in the company was false when Janeway was on the witness stand and swore he didn't have anything in it at all and said he thought someone gave him one or two shares of common stock. Ernsberger also told me on the morning before I bought the stock that the Oil Well Supply Company at that time had advanced them on open account $750,000.

I relied on the representations as to them having paid dividends, being out of debt and making money, or I would not have put in my money.

F. D. Coffield corroborated the above testimony as to what transpired on the visit to Oklahoma City in September, 1931.

Plaintiffs' evidence disclosed by minutes introduced that Dean M. Stacy and J. Murray Henry resigned as officers and directors of Western Service Corporation on September 23, 1930, and that their successors were thereafter duly elected. D. W. Ohern likewise resigned as secretary and director December 20, 1930, and his successor was thereafter elected in January 1931.

It is readily apparent that these three defendants, after ceasing to be officers and directors of the corporation in 1930, could not as such officers and directors have "personally participated or aided in any way in making" a sale of the stock of the corporation in 1931 under the terms of a law which became effective July 10, 1931, the particular transaction having been closed September 3, 1931. It was not claimed that any of the three thereafter acted as agent of the issuer or seller of the stock. At the close of plaintiffs' evidence each of these three defendants demurred thereto and the demurrers were overruled. We think these rulings by the trial court were erroneous.

T. E. Braniff and P. A. Janeway each separately demurred to the evidence of plaintiffs. These demurrers were properly overruled.

Both Braniff and Janeway are shown by the minutes of the board of directors to have been directors of Western Service Corporation during the period of time covered by the stock-selling campaign inaugurated by that corporation, and the evidence reasonably tends to support the finding of the trial court that they personally aided in making the sale to plaintiffs by permitting, or with knowledge thereof, not objecting to the use of their names and pictures and their business and financial standings in various forms of advertising literature used by the corporation's agents in inducing purchase of stock by plaintiffs and others.

Mr. Braniff introduced evidence and testified orally in contradiction of the corporate records showing his membership on the board of directors, but this evidence, if competent for that purpose, which we do not decide, merely raised a conflict in the evidence, which conflict the trial court resolved against his contentions. Since this is a law action wherein jury was waived, the findings of the trial court must be accorded the same force and effect as the verdict of a jury if there is any evidence reasonably tending to support the same. Young v. Smith, 171 Okla. 222, 41 P. 2d 461; Lowe v. Hickory, 176 Okla. 426, 55 P. 2d 769; Blackford v. Casey, 178 Okla. 268, 62 P. 2d 1023.

Mr. Janeway admitted his connection with Western Service Corporation as director, treasurer and vice president from April, 1931, until the corporation was placed in receivership. He denied any knowledge of any false and fraudulent representations made by any one in the sale of the corporation's stock and denied that he personally participated or aided in any way in the sale of such stock to plaintiffs or to any other persons. He denied all knowledge or even suspicion of the financial instability of the corporation until a very short time prior to the receivership proceedings. Like Mr. Braniff's evidence, this merely raised a conflict in the evidence which the trial court resolved against his contention.

The findings of the trial court that Braniff and Janeway participated in the sale of the corporate stock and that each of them personally aided in such sale may be fairly said to be based on competent evidence reasonably tending to support the same. A judgment based on such findings is not erroneous.

The judgment of the trial court as to Chemical Bank & Trust Company, Dean M. Stacy, J. Murray Henry, and D. W. Ohern is reversed, with direc-

612

tions to vacate the orders overruling the separate demurrers of these defendants to the evidence of plaintiffs and thereupon enter proper orders sustaining their demurrers and dismissing the action as to each of them. The judgment as to T. E. Braniff and P. A. Janeway is affirmed. The default as to J. D. Garnett, not having been appealed from, is already final and should not be disturbed.

RILEY, BAYLESS, WELCH, and CORN, JJ., concur. HURST, C.J., DAVISON, V.C.J., and GIBSON, J., dissent as to appellant Braniff.